# In the United States Court of Federal Claims

No. 08-911 C

(Filed July 8, 2009)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| L-3 COMMUNICATIONS | * | |
| EOTECH, INC., | * | |
| | * | |
| *Plaintiff,* | * | |
| | * | Pre-Award Bid Protest; Review |
| v. | * | of Army's Decision to Eliminate |
| | * | Protestor from Further |
| THE UNITED STATES, | * | Consideration; Supplementation |
| | * | of the Administrative Record. |
| *Defendant,* | * | |
| | * | |
| AIMPOINT, INC., | * | |
| | * | |
| *Intervenor-defendant.* | * | |
| * * * * * * * * * * * * * * | * | |

*W. Jay DeVecchio*, Washington, DC, for plaintiff.  *Kevin C. Dwyer*, *Daniel E. Chudd*, *Damien C. Specht* and *Caroline A. Keller*, Washington, DC, of counsel.

*Jacob A. Schunk*, United States Department of Justice, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Harold D. Lester, Jr.*, Assistant Director, Washington, DC, for defendant.

*Lawrence Block*, Washington, DC, for intervenor-defendant.  *Dennis Lane*, Washington, DC, of counsel.

---

[1]/  This opinion was issued under seal on June 18, 2009.  Pursuant to ¶ 13 of the ordering language, the parties identified proprietary material subject to deletion on the basis that the material was protected/privileged.  Brackets ([ ]) identify the material deleted.

_____

## OPINION

_____

**Bush**, *Judge*.

This pre-award bid protest is before the court on Defendant's Motion for Relief from Stay (Def.'s Mot.), filed May 5, 2009, and Plaintiff's Motion to Enforce the Court's Injunction (Pl.'s Mot.), filed May 22, 2009.  The court also has before it the administrative record (AR), as supplemented on January 22, 2009, May 26, 2009 and May 27, 2009.  Although the titles of the motions before the court are not fully indicative of their dispositive nature, the parties and the court agreed to treat these motions as cross-motions for judgment on the administrative record that address the merits of this bid protest.[2]  *See* Order of May 19, 2009.

_____

[2]/  Plaintiff suggested for the first time at oral argument that the proper lens through which to view defendant's motion is that of Rule 60(b)(5) of the Rules of the United States Court of Federal Claims (RCFC), "Relief From a Judgment or Order."  Tr. at 16, 24-25, 27, 30.  Plaintiff must not be allowed to advance new legal theories at oral argument, prejudicing defendant.  *See Arakaki v. United States*, 62 Fed. Cl. 244, 246 n.9 (2004) ("The court will not consider arguments that were presented for the first time in a reply brief or after briefing was complete." (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002))); *Res. Recycling Corp. v. United States*, 56 Fed. Cl. 612, 618 (2003) (noting that "courts are rightfully loathe to allow a party to raise an issue at oral argument for the first time because there is a lack of notice to the court and adversary" (citing *Cubic Def. Sys., Inc. v. United States*, 45 Fed. Cl. 450, 466-68 (1999))).  Plaintiff waived any right to advance arguments it had not briefed prior to oral argument.  *See Cubic*, 45 Fed. Cl. at 467 (ruling that arguments presented for the first time at oral argument were "out of order").

The court notes that, even if plaintiff's argument was not waived, the court and the parties agreed during the May 19, 2009 conference call to treat the motions submitted here as cross-motions for judgment on the administrative record.  Defendant's motion addresses the merits of plaintiff's bid protest and relies on documents which are included in the administrative record.  Plaintiff filed its own motion addressing the merits of this protest.  The parties agreed to a briefing schedule to "resolve the merits of this protest," and the Army agreed to postpone further procurement activities until the court issued its decision on the parties' cross-motions.  Order of May 19, 2009 at 3.  The standard of review for resolving cross-motions for judgment on the administrative record pursuant to RCFC 52.1(c) applies in this instance.

This suit is a bid protest of actions the government has taken following this court's invalidation and injunction, in August of 2008, of a competitive range determination in the procurement of optical rifle sights, also known as close combat optics (CCOs).  *See L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643 (2008) (*L-3 I*), *appeal docketed*, No. 2008-5111 (Fed. Cir. Aug. 28, 2008). L-3 Communications EOTech, Inc. (L-3) now challenges its impending elimination, once again, from the competitive range for Solicitation No. W15QKN-07-R-0428 (the solicitation).[3]  The solicitation was issued by the United States Army Joint Munitions and Lethality Life Cycle Management Command Acquisition Center (the Army).  Aimpoint, Inc. (Aimpoint), the incumbent contractor providing CCOs to the Army, AR at 3, and the only offeror still being considered for this procurement, intervenes in this suit.

Oral argument was held on June 2, 2009, and this protest is now ripe for adjudication.  For the reasons discussed below, defendant's motion is granted, and the stay in this case is lifted.  The Army may proceed with its competitive range determination and may eliminate L-3 from further consideration as an offeror under the solicitation.  [ ].

## BACKGROUND[4]

### I.      Litigation History

The facts relevant to this bid protest have given rise to one fully litigated protest before the United States Government Accountability Office (GAO), and three separate bid protests in this court, all of which were assigned to the undersigned.  On August 2, 2007, the Army issued Solicitation No. W15QKN-07-R-0428, for a five year Indefinite Delivery Indefinite Quantity (IDIQ) type contract

---

[3]/  The Army has not issued a new competitive range determination eliminating L-3 from this competition, pursuant to the stay entered in this case on February 27, 2009.  The Army has indicated, however, that once the stay in this case is lifted, the Army will make such a determination.  *See* AR at 1042.

[4]/  This protest was decided on an expedited schedule, and for this reason only the most essential facts are recounted here.  An earlier opinion discusses the Army's procurement of optical rifle sights in more detail.  *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643 (2008), *appeal docketed*, No. 2008-5111 (Fed. Cir. Aug. 28, 2008).

(the contract), with two additional option years.  AR at 74.  This contract will provide CCOs compatible with both the M4 carbine and M16 series rifles.

On March 17, 2008, the Army determined that [ ] Aimpoint's bid sample [ ] was the only product which, after discussions with Aimpoint were concluded, could meet the needs of the Army under the contract.  AR at 351.  On April 3, 2008, L-3, a bidder on the contract, protested to GAO.  GAO held in favor of the Army and Aimpoint, and denied L-3's protest on July 14, 2008.  One day later, L-3 filed a bid protest complaint in this court.  That case, No. 08-515C, was decided on August 15, 2008, at which time the court enjoined the Army from proceeding with award of the contract based on its March 17, 2008 competitive range determination.  The court also ordered the Army to retest L-3's bid sample, if the Army chose to proceed with the solicitation for the contract.  The court's decision was appealed by Aimpoint to the United States Court of Appeals for the Federal Circuit, and Aimpoint's appeal is pending as of this date.[5]

On December 22, 2008, L-3 filed the instant protest in this court, challenging the Army's conduct in the initial retesting (2008 retesting) of L-3's bid sample, and L-3's elimination from this competition.[6]  Two primary arguments were presented by plaintiff in the early stages of this bid protest.[7]  First, L-3 asserted that the Army's decision to retest L-3's bid sample for the "Reattachment" essential criterion, in addition to the "Endurance-Live Fire" essential criterion, exhibited "gross disparate treatment" and was "irrational."  Pl.'s First Mot. at 20-21.  Second, plaintiff argued that the Army's retesting procedures for the

---

[5]/  L-3 later unsuccessfully protested a bridge contract award to Aimpoint which is currently providing the Army and the Air Force with CCOs.  *See L-3 Commc'ns EOTech, Inc. v. United States*, 85 Fed. Cl. 667 (2009).

[6]/  The Army based this decision to eliminate L-3 from the competition on its initial retesting of L-3's bid sample, retesting that occurred between August 2008 and the middle of December 2008.  *See* AR Tab 33.  The Army notified L-3 that it had failed retesting and was again being removed from consideration for this procurement on December 16, 2008.  AR at 943-46.

[7]/  Plaintiff's Motion for Judgment upon the Administrative Record (Pl.'s First Mot.), filed January 29, 2009, has been overtaken by subsequent events and is moot, as are Defendant's Motion for Judgment upon the Administrative Record (Def.'s First Mot.) and Intervenor Aimpoint, Inc.'s Motion for Judgment Pursuant to Rule 52.1 (Aimpoint's First Mot.), both filed February 13, 2009.

Reattachment criterion were "irrational" and contained a "series of errors." *Id.* at 25, 27.  For its arguments, plaintiff relied in part on two declarations from its employees, which defendant moved to strike.[8]  The Army initially agreed to stay award of the contract until March 17, 2009, pending the resolution of L-3's protest.

The parties' initial cross-motions for judgment on the administrative record were fully briefed in February 2009.  Before supplemental briefing ordered by the court and oral argument could take place, however, defendant notified the court of its decision to cancel the solicitation, and moved to dismiss this protest on February 25, 2009.  After a stay was imposed to allow the Army time to formally cancel the solicitation, defendant reconsidered its decision to abandon the procurement, and the parties began to negotiate a second retesting procedure for L-3's CCO bid sample.  These negotiations continued through March 2009 and part of April 2009.  [ ].

The Army eventually adopted a protocol for another retesting of L-3's bid sample, which occurred at the end of April 2009 (2009 retesting).  On May 5, 2009, defendant filed a status report describing the 2009 retesting results.  Included within the status report was defendant's motion for relief from stay, which requested that the Army be allowed "to issue a competitive range determination." Def.'s Mot. at 1.  At a subsequent conference call, the parties agreed to address the merits of this bid protest on an expedited briefing schedule, thus mooting various dispositive motions that had been stayed.  The Army agreed to delay a new competitive range determination until the court issues its decision on the merits of this bid protest.

## II.    Bid Sample Testing History[9]

### A.    2007 Testing of All Bid Samples

---

[8]/  These declarations were never offered to the court as proposed supplements to the administrative record.  The court deferred ruling on defendant's (first) motion to strike, and permitted defendant to file rebuttal declarations.  These declarations, and another declaration, filed by plaintiff in May 2009, are discussed *infra* in the Supplementation of the Administrative Record section of this opinion.

[9]/  The court restricts its recitation to the facts most relevant to this protest.

The solicitation describes six evaluation factors, ranked in descending order of importance:

> (1) Bid Sample Testing (significantly more important than the next factor)
> (2) Quality System Plan
> (3) Equipment Facilities and Production Rates
> (4) Evaluated Price
> (5) Performance Risk (including past performance)
> (6) Small Disadvantaged Business Participation.

AR at 141-52.  In *L-3 I*, this court reviewed the bid sample testing conducted largely in 2007 for all of the bid samples submitted by four offerors in response to the solicitation (2007 testing).  Unlike the first protest of this procurement, the instant protest has a more narrow focus and largely concerns the bid sample testing procedures undertaken during the 2008 and 2009 retesting of L-3's bid sample.

The bid sample testing required by the solicitation is divided into two subfactors, Essential Criteria, the first phase of testing, which includes fifteen testing components, and Rated Criteria, the second testing phase, which includes seven testing components.  AR at 142-46.  The first phase of the testing could be described as an elimination round, because "[a] failure in any one or more of the [fifteen] essential criteria as stated shall be cause for elimination from further consideration for award and offeror[']s submission will not be further evaluated. No extra credit will be awarded for exceeding the pass/fail requirements, in this category."  *Id.* at 142.  If a bid sample makes it to the second round of testing for the seven Rated Criteria, each of the seven criteria will be assigned a rating of Excellent, Good, Satisfactory or Unsatisfactory.  *Id.* at 144-46.  These seven individual ratings in the second phase of testing are amalgamated into an "overall color rating" of Blue, Green, Yellow or Red.  *Id.* at 146.

The fifteen Essential Criteria in the elimination round are:
(1) Magnification, (2) Clear Aperture, (3) Dot Angular Spot Size, (4) Parallax, (5) Azimuth and Elevation Adjustments, (6) Housing, (7) Mounting, (8) Weight, (9) Power Source, (10) Endurance-Live Fire, (11) Reattachment, (12) Illuminance, (13) Equipment Compatibility/Operability, (14) Height Above Bore, and (15) Environmental Testing (for Temperature Extremes, Sand and Dust, Thermal Shock, and Sealing).  AR at 142-44.  There are two Essential Criteria of particular

importance here – Endurance-Live Fire and Reattachment.  The Endurance-Live Fire test description states that

> [t]he bid sample shall be mounted on the M16A2 Rifle and shall withstand a 6,000 round endurance firing with no physical damage and maintain zero within 1 Gunner's mil after 2,000 rounds.  This test shall also be performed on the M4 Carbine.

*Id.* at 178.   The Reattachment test description states that

> [t]he sight shall be mounted to a M16 rifle carry handle, and, separately, a [M4] rail.  These combinations shall be separately mounted to equipment capable of measuring angular deviations as small as 10 arc-seconds.  A reference zero shall be recorded.  The sight shall be cycled on and off the mount (M16 rifle carry handle itself, and [M4] rail itself, independently), ten (10) times. The line of sight shall be maintained within 0.33 mils.[10]

*Id.* at 143.

L-3 failed the Endurance-Live Fire testing on the M16 in the 2007 testing, but passed every other Essential Criteria, including the Reattachment test.  AR at 201.  Aimpoint passed all of the Essential Criteria [ ].  Only Aimpoint [ ] remained in competition for the contract after the 2007 bid sample testing.

Because Aimpoint [ ].  *Id.*  The technical team concluded that "Aimpoint [ ] represents the best value to the US Government as the best material solution for the CCO."  *Id.*

**B.     2008 Retesting of L-3's Bid Sample**

---

[10]/  A mil, like an arc-second, is a unit of measurement for angular deviations.

After the court enjoined the Army's March 17, 2008 competitive range determination, the Army contacted L-3 on August 20, 2008 and requested a new bid sample, in order to conduct Endurance-Live Fire retesting.  AR at 919.  [ ].

The first bid sample sent by L-3 was not, however, identical.  AR at 925.  [ ].[11]  *Id.*  L-3, when notified of the problem, "apologized for the inconvenience" and indicated that it would provide a new bid sample identical to the bid samples provided in 2007.  *Id.* at 924.  The Army warned that receipt of another bid sample not identical to the 2007 samples would result in L-3's elimination from consideration for the contract.[12]  *Id.*

It is undisputed that L-3, after submitting a new bid sample to the Army, passed the Endurance-Live Fire retesting provided by the Army on October 2, 2008.  AR at 968, 973.  After L-3 passed the Endurance-Live Fire retest, the Army then required L-3 to undergo a retest of Reattachment, an Essential Criteria component which L-3 had previously passed.  The Army's rationale for a second Reattachment test is presented in the administrative record:

> The Reattachment of a sight to the cantilever is directly impacted by the sight's mounting (i.e., attachment) instructions.  It is the Source Selection Evaluation Team's (SSET) determination that L-3's new instruction on how to attach its optic to the M16A2 carry handle (i.e., in an effort to address its initial failure of the Endurance Live Fire test essential criterion) has a direct

---

[11]/  The attachment of a CCO to the M16 carry handle requires a special mount, sometimes referred to as a gooseneck mount or a cantilever mount.

[12]/  At oral argument, plaintiff's counsel suggested that this correspondence between the Army and L-3 indicates that the Army had acquiesced to retesting bid samples that were not identical to the 2007 bid samples.  Tr. at 29-30, 47-49 (citing AR at 923-24).  It is true that the Army did not immediately eliminate L-3 from further competition in September 2008 when L-3 submitted a non-identical bid sample.  The record pointed to by plaintiff does not, however, show that the Army acquiesced to the retesting of non-identical bid samples, or that the Army waived its requirement that only identical bid samples would be acceptable for retesting procedures.  To the contrary, this correspondence can only be read to give L-3 notice that the submission of bid samples that were not identical to the 2007 bid samples would be adequate cause for the elimination of L-3 from this competition.

> impact on how the optic maintains zero after
> Reattachment (i.e., another essential criterion).
> Accordingly, in keeping with the Army's commitment to
> provide systems to the Warfighter that meet all of the
> performance requirements, the SSET determined to
> re-test the L-3 optic using L-3's new mounting
> instructions to ensure that the new instructions did not
> negatively impact the sight's ability to maintain zero after
> Reattachment.

*Id.* at 969.  The Army retested L-3's bid sample for the Reattachment criterion on October 15, 2008, and ruled that L-3 had failed this retest.  *Id.* at 968.  After certain delays and correspondence between L-3 and the Army, the Army again retested L-3's bid sample for the Reattachment criterion on December 11, 2008.  *Id.*  The Army ruled again that L-3 had failed this second Reattachment retest.  *Id.* at 973. L-3 was allowed to have an observer at each of the 2008 retests.  The Army notified L-3 on December 16, 2008 that it had again been eliminated from this competition.  *Id.* at 943-46.

### C.      2009 Retesting of L-3's Bid Sample

After L-3 lodged a bid protest contesting the results of the Army's 2008 retesting of L-3's bid sample, it became clear to the parties that the 2008 Reattachment retests had been conducted using procedures that were not identical to those used during the 2007 Reattachment testing of all bid samples.  Pl.'s Mot. at 6; Def.'s Reply at 3.  Nor had the Endurance-Live Fire retesting been conducted in the same fashion as the 2007 Endurance-Live Fire testing of all bid samples. Def.'s Reply at 3.  The Army and the parties discussed various corrective actions, including cancelling the solicitation, and began negotiations on a new retesting protocol that would obtain results that could be used to produce a competitive range determination in accordance with the court's injunction.  Complete agreement was not achieved on this protocol.  The Army eventually established procedures for the 2009 retesting for the Reattachment and Endurance-Live Fire criteria, and provisions were made for two observers, one from L-3 and another from a different Army facility, to attend the retesting in New Jersey in late April 2009.

The 2009 retests did not go smoothly.  L-3's observer did not show up for the first day of the testing, April 27, 2009.  AR at 994.  [ ].  L-3 did not pass the Reattachment test under these conditions.  *Id.* at 1066-67.

More importantly, the Army technicians, the Army observer and L-3's substitute observer noted that the 2009 bid samples were not identical to L-3's 2007 bid samples.  AR at 1024-25, 1031-33, 1062-64.  Eventually, four differences were discovered.  *Id.*  The Army requested an explanation regarding two of the differences from L-3, and received correspondence from L-3 in return.  *Id.* at 1005-06, 1012-14.  L-3 also delivered certain replacement bid sample parts to the Army, and offered to obtain and provide additional replacement parts.  *Id.* at 1007, 1014.  The Army rejected these offers and eliminated L-3 from further consideration, noting that L-3's failure to provide identical bid samples could lead to its CCO being placed in the competitive range when its CCO had not met essential criteria.  *Id.* at 1041.  [ ].

## DISCUSSION

## I.    Jurisdiction

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2006).  The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded."  *Id.*  Because L-3 objects to the proposed award of the contract to Aimpoint, this court has subject matter jurisdiction to entertain this bid protest.

## II.   Standards of Review

### A.    Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record.  To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57

(Fed. Cir. 2005).  The court must make factual findings where necessary.  *Id.*  The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record.  *Id.*  This court's resolution of the merits of a bid protest typically requires review of cross-motions for judgment on the administrative record.  *Cf. id.* at 1356 (stating that "in the context of this [bid protest] action the judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record"); *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 200 (2007) ("*Bannum's* approach to motions for judgment on the administrative record makes particular sense given the limited nature of the review conducted in bid protests.").

### B.     Bid Protest Review

As a threshold jurisdictional matter, the plaintiff in a bid protest must show that it has standing to bring the suit.  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*).  Standing arises from prejudice, which is proven by establishing that the plaintiff had a substantial chance of receiving the contract, but for the alleged procurement error.  *Id.* (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).  A protestor possessing a "substantial chance" of winning the contract has a "direct economic interest" in the procurement, and has standing before this court.  *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307-08 (Fed. Cir. 2006) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002)).

As the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006), a standard used in the Administrative Procedure Act (APA)]:  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  Under this APA standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure.  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted).  *De minimis* errors in the procurement process, however, do not justify relief.  *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929,

932-33, 935 (Fed. Cir. 1992)).  The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question.  *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

The court gives great deference to an agency's technical evaluation of an offeror's proposal.  "[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (citations omitted); *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals." (citing *E.W. Bliss*, 77 F.3d at 449)).  "[W]here an agency's decisions are highly technical in nature, . . . judicial restraint is appropriate and proper." *Electro-Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985) (citing *Isometrics v. United States*, 5 Cl. Ct. 420, 423 (1984)).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).  If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351.  Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted).  If a protestor can show that, but for the procurement error of the agency, there was a substantial chance that it would have won the contract award, prejudice has been established. *Id.* at 1353 (citations omitted).  "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## III.   Standing

L-3 was the only offeror besides Aimpoint still eligible for this procurement after the court issued *L-3 I*.  If L-3 had passed the Essential Criteria retesting of its bid sample, L-3 would have been eligible for further evaluation of its bid sample, and might have been included in the competitive range.  But for the

decision-making and retesting errors alleged by plaintiff to have unjustly eliminated its bid sample from this competition, L-3 had a substantial chance of winning the Army contract. L-3 therefore has standing to bring this protest of the Army's retesting of its bid sample. *ITAC*, 316 F.3d at 1319 (citation omitted).

Defendant raises a standing challenge to one of L-3's arguments, that of disparate treatment.[13] Plaintiff's disparate treatment argument focuses mainly on a perceived difference in the treatment of L-3, in its elimination resulting from the required 2009 Reattachment retesting, as compared to the lack of any planned Essential Criteria retesting of Aimpoint's CCO, after the Army obtains, through discussions with Aimpoint, [ ] Aimpoint [ ].[14] *See* Pl.'s Mot. at 10-11. Defendant suggests that L-3 "lacks standing to challenge any alleged unfairness resulting from the future discussion the Army may or may not have with Aimpoint." Def.'s Reply at 15.

Defendant specifically points to actions of L-3 which, in defendant's view, have "render[ed] L-3 ineligible for an award" in this procurement. *Id.* at 14. Defendant suggests that because L-3 does not have a substantial chance of receiving this award, L-3 lacks standing to make its disparate treatment argument. *Id.* Defendant fails to cite to any authority, and the court has found none, for the proposition that a protestor must show that it has standing for each and every argument it has raised in requesting relief from this court.

------

[13]/ Defendant raises essentially the same argument as to L-3's lack of standing regarding L-3's challenge to the Army's decision to retest L-3 for the Reattachment criterion. Def.'s Reply at 17. This standing argument has no more merit than the one rejected in this section of the opinion, for precisely the same reasons.

[14]/ L-3 also argues that its bid samples' "dissection" during retesting was more rigorous than the inspection of other bid samples, and that this constitutes disparate treatment as well. Pl.'s Mot. at 15. The close examination of L-3's 2009 bid samples was rational, because apparent changes in the appearance and fit of L-3's 2009 bid samples were noted during the 2009 retesting. AR at 1024-25, 1031-33, 1062-63. There is no indication in the record that such differences were noted by the Army when it tested the 2007 bid samples of other offerors, including Aimpoint. Thus, L-3 and Aimpoint were not similarly situated in this regard, and could receive different treatment that has a fair and rational basis. *See* 48 C.F.R. § 1.102-2(c)(3) (2008) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same."). The court rejects plaintiff's argument that the Army had no right to closely examine L-3's 2009 bid samples once it had noted obvious differences between those samples and L-3's 2007 bid samples.

L-3 has standing for this protest because it is an offeror with a substantial chance of winning the contract, but for the errors it alleges in the retesting of its bid sample.  Some of the alleged errors by the Army predate the actions by L-3 that defendant views as disqualifying events, and, in any case, the sequence of events in the 2008 and 2009 retesting procedures is a chain of interconnected events.  The court must examine the retesting process in its entirety to determine whether or not the Army's decision to eliminate L-3 from this procurement is arbitrary or capricious.  L-3 alleges that this retesting process was infected with irrational decision-making, retesting errors, and disparate treatment which would occur as a result of the Army's proposed discussions with Aimpoint.  All of these allegations question the propriety of the Army's retesting of L-3's bid sample and the imminent establishment of a competitive range excluding L-3.  Standing to bring this suit is not undermined by plaintiff's arguments that focus on contemplated acts of the Army, because these arguments go to the totality of the circumstances of the Army's decision to eliminate L-3 from further consideration.  Whether L-3 will prevail on the merits of its disparate treatment argument is not a question of standing.

## IV.   The Army's Decision to Retest L-3's Bid Sample for the Reattachment Criterion

This court ordered the Army to give L-3 another chance to pass the Endurance-Live Fire test, if the Army wished to proceed under the solicitation:

> If the United States Department of the Army elects to proceed with this procurement, the Army must **RETEST** [L-3]'s bid sample for Endurance-Live Fire Essential Criteria on the M16A2 rifle pursuant to the requirements of the amended solicitation, after **CLARIFYING** with L-3 how its gooseneck mount should properly be secured to the M16A2 rifle, in order to determine whether [L-3's] proposal should be placed in the competitive range[.]

*L-3 I*, 83 Fed. Cl. at 661.  Plaintiff now argues that once it had passed the October 2, 2008 Endurance-Live Fire retesting, "[t]his should have been the end of the essential criterion retesting."  Pl.'s Mot. at 11.  The court, however, defers to the Army's decision to require a Reattachment retest of L-3's bid sample, following the new attachment instructions provided by L-3.  This is an example of a highly

14

technical decision best left to the discretion of the procuring agency, not to courts. *See Omega World Travel*, 54 Fed. Cl. at 578 ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals." (citing *E.W. Bliss*, 77 F.3d at 449)).

For the 2007 testing of its bid sample, L-3's instructions as to how to fix its gooseneck mount on the M16 rifle simply stated:  "Secure the locking nut."  AR at 426.  These instructions were greatly expanded for the 2008 Endurance-Live Fire retesting of its bid sample, and use of a hex wrench was specified.  *See id.* at 950-51.  [ ].

Reattachment testing focuses on whether the CCO, after being removed and reattached to the rifle several times, will maintain its line of sight within a certain deviation:

> The sight shall be cycled on and off the mount (M16 rifle carry handle itself, and [M4] rail itself, independently), ten (10) times.  The line of sight shall be maintained within 0.33 mils.

AR at 143.  Because L-3 made substantive changes to the attachment instructions provided with its bid sample, it was not unreasonable for the Army to seek to confirm that the changes in L-3's mounting instructions did not invalidate the passing score that L-3 had achieved in the 2007 Reattachment testing.  *See id.* at 969 (describing the Army's decision "to re-test the L-3 optic using L-3's new mounting instructions [so as] to ensure that the new instructions did not negatively impact the sight's ability to maintain zero after Reattachment").  For this reason, the court finds nothing arbitrary or capricious in the Army's decision to retest L-3's bid sample for the Reattachment criterion in the 2008 and 2009 retesting.

## V.    Elimination for Failure to Provide Identical Bid Samples

### A.    The Army's Decision to Require Identical Bid Samples Was Neither Arbitrary Nor Capricious

As a threshold matter, defendant argues that the Army's requirement that L-3 provide identical bid samples for the 2008 and 2009 retesting is unassailable. First, the solicitation requires "twenty (20) identical and complete Bid Samples."

AR at 134.  As retesting procedures were arranged in 2008 and 2009, the Army repeatedly communicated to L-3 that identical bid samples were required, and that L-3 would need to certify that its 2008 and 2009 bid samples were identical to its 2007 bid samples.  *See id.* at 924-25, 930, 932, 1037-38, 1043.  There is no indication in the record that L-3 objected to the Army's requirement that identical bid samples were required for any and all retesting procedures.

L-3 now argues that "the Army created an arbitrary standard for 'identical' bid samples."  Pl.'s Mot. at 13.  Defendant argues that plaintiff's argument is foreclosed by the waiver rule announced in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).  Def.'s Reply at 10.  That decision holds that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims."  *Blue and Gold Fleet*, 492 F.3d at 1315.  The waiver rule cited by defendant is good law, and the court agrees that the *Blue and Gold Fleet* rule applies to these circumstances.

Defendant first suggests that "L-3's failure to raise [the identical bid sample] issue at the time the Army issued the Solicitation" may have waived L-3's challenge to Army's insistence on identical bid samples at this juncture.  Def.'s Reply at 10.  Such an objection would have made little sense at the time, because the solicitation's requirement that each offeror submit twenty identical 2007 bid samples was not then, nor is it now, a matter of dispute between the parties.  It was when the solicitation's requirement for identical bid samples was later confirmed to be a condition for L-3's 2008 and 2009 bid samples that the identical bid sample issue became a protestable event.

Defendant argues that L-3 was required by the *Blue and Gold Fleet* rule to raise any objection to the Army's requirement of identical bid samples for the 2008 and 2009 retesting at the time the Army notified L-3 of this retesting condition.  Def.'s Reply at 10.  Here, L-3 could have objected to the Army's requirement of identical bid samples before the 2008 retesting began in October 2008, but failed to do so.  L-3 had a second opportunity to protest the identical bid sample requirement before the final round of the 2008 retesting began in December 2008, but again failed to do so.  Finally, L-3 had yet another opportunity to protest the identical bid sample requirement in April 2009, and yet again chose not to do so.

L-3 had notice of the identical bid sample requirement throughout the 2008 and 2009 retesting, but repeatedly ignored all opportunities to protest this requirement.

Instead, L-3 waited until after all retesting results were evaluated by the Army and L-3's CCO had been eliminated from this competition to challenge the Army's requirement of identical bid samples.  Pl.'s Mot. at 14.  This failure to lodge a timely protest is proscribed by *Blue and Gold Fleet*.  *See* 492 F.3d at 1314 ("'Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm.'" (quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 175 n.14 (2005))).  Plaintiff cannot complain that the Army's decision to require identical bid samples for the 2008 and 2009 retesting is arbitrary or capricious, because this argument has been waived.

Even if plaintiff had not waived this argument, L-3's challenge to the Army's requirement of identical bid samples has no merit.  The court believes that such a requirement rationally allowed for the comprehensive, efficient and fair testing of L-3's bid sample for the Essential Criteria listed in the solicitation and reasonably responded to the court's injunction that provided L-3 with a second chance to pass the Endurance-Live Fire test.  For the Army to have allowed L-3 to submit non-identical bid samples for the Army's 2008 and 2009 retesting procedures would have been irrational, contrary to the solicitation, and unfair to other offerors in this competition.

## B.      L-3's 2009 Bid Sample Was Not Identical to Its 2007 Bid Samples

It is undisputed that the bid samples offered by L-3 to the Army in 2009 were different from L-3's 2007 bid samples.  AR at 1004-06, 1024-25, 1031-33, 1039-41, 1054, 1062-64; Pl.'s Mot. at 9 (commenting on these bid sample differences and stating that "half of which have already been explained to the Army and all of which can be alleviated").  Plaintiff asserts, nonetheless, that "there is no material difference in L-3's bid samples."  Pl.'s Mot. at 13.  Plaintiff's discussion of the bid sample differences suggests that elapsed time between 2007 and 2009, with the accompanying change of suppliers and product updates, largely explains the differences, *id.* at 16-23, and that, in any event, the differences "were minor and should have no impact on CCO performance," *id.* at 18.

17

The court need not address plaintiff's explanation of the reasons for the differences between its 2007 and 2009 bid samples. The fact remains that L-3 submitted non-identical bid samples for the 2009 retesting, and the record supports the Army's characterization of the bid sample differences as material. [ ]. These differences were deemed to be material, *id.* at 1042, and the court finds nothing arbitrary or capricious in the Army's technical assessment. Even if the court disagreed with the Army's assessment that L-3's 2009 bid samples were materially different, which the court does not, this is a technical evaluation decision to which the court must defer. *E.W. Bliss*, 77 F.3d at 449.

### C.   The Army's Decision to Cancel Further Retesting Was Rational and Did Not Contravene the Court's Injunction in *L-3 I*

L-3 appears to argue that even if the differences in its bid samples were material, the Army should have permitted L-3 to cure its error, either by using leftover 2007 bid samples or by allowing L-3 to provide another set of bid samples. Pl.'s Mot. at 19 (noting that "[t]he Army had in its possession previously submitted L-3 bid samples that it could have tested . . . [and] L-3 also supplied the previously produced cantilever mounts and offered to supply the original knurled knobs and washers to allow the Army to continue the retest"). L-3 also argues that the Army cannot stop the retesting of L-3's CCO until a proper Endurance-Live Fire test has been conducted. The court disagrees with all of these arguments.

The parties devoted considerable effort and time to negotiations in hopes of achieving a compromise on an acceptable 2009 retesting protocol. L-3 had notice that the Army sought new, identical bid samples for this retesting. AR at 987. It appears that a suggestion was made to reuse L-3's 2007 bid samples, but the Army chose to require new bid samples for the 2009 retest.[15] The court finds nothing irrational in the Army's decision, particularly given the contentious nature of this series of bid protests and the need to avoid any appearance of unfairness in the 2009 retesting. The court also finds nothing arbitrary or capricious in the Army's decision to refrain from retesting 2007 bid samples once the 2009 bid samples had proved to be non-identical. The Army's technical evaluation decision, requiring

---

[15]/ The parties present vigorously conflicting versions of these negotiations, and dispute the advisability of reusing the 2007 bid samples for the 2009 retesting. The court views the Army's decision to require new bid samples to be within the Army's discretion, and consonant with the August 15, 2008 injunction entered in *L-3 I*.

new identical bid samples for the 2009 retesting, requires deference from this court and has not been shown to be arbitrary or capricious.

The court also finds nothing arbitrary or capricious in the Army's decision to reject any subsequent offers from L-3 suggesting that L-3 could provide identical bid samples, if given another chance. This procurement is already much delayed, and has spawned at least four bid protests. [ ]. The Army cannot justifiably be required to expend more resources on retesting a new set of bid samples, when L-3, with full notice of this requirement, failed to provide the CCOs that would have permitted valid retesting procedures to go forward.[16]

Finally, L-3 suggests that the court's injunction entered in *L-3 I* bars the Army from terminating L-3's retesting opportunities at this juncture, because no valid Endurance-Live Fire test has yet been administered. *See* Pl.'s Mot. at 14 ("The Army does not have the authority simply to stop testing."). This argument is ill-founded as well. The Army scheduled Endurance-Live Fire retesting of L-3's bid samples for late April 2009. L-3 assented to this procedure and offered non-identical bid samples, notwithstanding: (1) its awareness of the Army's requirement for identical bid samples, and (2) [ ]. L-3 cannot now rely on the injunction that provided L-3 a second chance to pass Endurance-Live Fire retesting, when its own actions sabotaged its chances of passing valid Endurance-Live Fire retesting and caused the cancellation of those retests. Plaintiff would elevate the form of the injunction over the substance of the court's decree.

The August 15, 2008 permanent injunction states that for this procurement to proceed "the Army must **RETEST** [L-3]'s bid sample for Endurance-Live Fire Essential Criteria on the M16A2 rifle pursuant to the requirements of the amended solicitation." *L-3 I*, 83 Fed. Cl. at 661. The injunction has been fully satisfied because L-3 failed to constructively cooperate in a scheduled, valid Endurance-Live Fire retesting opportunity provided by the Army. Under these circumstances, the Army has no continuing duty to perform an invalid Endurance-Live Fire retest on non-identical bid samples. The court upholds the

---

[16]/  Because L-3 [ ], defendant and intervenor-defendant argue that this [ ] is an independent and sufficient reason for the Army to eliminate L-3 from this competition. [ ]. The court need not reach the false certification issue in this opinion, because the Army's elimination of L-3 from this competition is justified by L-3's submission of non-identical bid samples for the 2009 retesting.

Army's decision to terminate the 2009 retesting of L-3's bid samples because that decision was neither arbitrary nor capricious.[17]

## VI.   Disparate Treatment

Plaintiff's only other substantive argument relates to "the Army's decision not to retest Aimpoint's [ ] sights."  Pl.'s Mot. at 10.  The Army, in a previous competitive range determination, intended to obtain, through discussions, [ ] and did not intend to retest Aimpoint [ ] for Essential Criteria.  AR at 351.  L-3 considers this to be disparate treatment, for two reasons.  First, plaintiff argues that its [ ] should not have triggered Reattachment retesting, if Aimpoint [ ] is not going to be retested [ ].  *See* Pl.'s Mot. at 12 ("[T]he Army's insistence that L-3 must b[e] subject to another essential criteria retest, while failing to retest Aimpoint's [ ], exhibits gross disparate treatment and cannot stand.").  Second, plaintiff argues that the Army's rationale for eliminating L-3's CCO from this competition, a concern that identical bid samples pass comprehensive Essential Criteria testing, will be ignored when the Army purchases [ ] Aimpoint [ ], [ ] bid samples [ ].  *Id.* at 15-16.  The court will address each of these contentions in turn.

As a threshold matter, the court notes that disparate treatment was one of plaintiff's contentions discussed in *L-3 I*.  *See* 83 Fed. Cl. at 651-53.  In the testing and evaluation of the 2007 bid samples, the court found an array of inconsistencies

_____

[17]/  The court does not see any need for the Army to request relief from the August 15, 2008 injunction, because that injunction has been fully satisfied.  If relief from that injunction were deemed to be required under these circumstances, the court finds that the continuing and prospective application of the court's injunction directing the Army to retest L-3's CCO for the Endurance-Live Fire criterion "is no longer equitable."  RCFC 60(b)(5); *see also Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360-61 (Fed. Cir. 2008) ("Due to the equitable nature of injunctive relief, district courts have wide discretion to determine under what circumstances the grant of injunctive relief is appropriate, and under what circumstances the modification or dissolution of that injunction is warranted.") (citations omitted).  The Army has provided L-3 with a fair opportunity to compete.  When the factors supporting the August 15, 2008 injunction are reweighed, the public interest favors the Army, and L-3's principal allegations of arbitrary and capricious decision-making have no foundation.  *See L-3 I*, 83 Fed. Cl. at 660-61.  As a result of the 2009 retesting, L-3 no longer has a right to any further injunctive relief afforded by this court's August 2008 decision.  *See Amado*, 517 F.3d at 1361 (holding in that case that the "district court's ultimate decision to dissolve the injunction was not an abuse of discretion, when, after applying the traditional four-factor test, it determined that an injunction was no longer equitable under the circumstances").

and flawed decision-making which, when viewed as a totality of circumstances, produced an arbitrary and capricious "cumulative effect." *Id.* at 651.  The context of the Army's actions in 2007 and early 2008 was entirely different, and involved larger and more complex issues, than this protest of the Army's response to the court's injunction and its intention to again issue a competitive range determination including just one offeror in the competitive range.  Although the court found many problems with the Army's initial competitive range determination, including disparate treatment, these problems were analyzed for their cumulative effect in the context of that earlier phase of this procurement.  The court's injunction focused on and corrected the Army's principal error, that of testing L-3's bid sample without clarification of its attachment instructions.  *Id.* at 661.  But for that principal error in the 2007 bid sample testing, the court's analysis of the disparate treatment issue would necessarily have been quite different.

## A.     Required Reattachment Testing for L-3's Bid Sample

As discussed *supra*, the court finds nothing irrational, arbitrary or capricious in the Army's decision to retest L-3's bid sample for the Reattachment criterion. After L-3 modified and amplified its attachment instructions, L-3 had a second chance to pass the Essential Criteria round of testing.  The principal error in the 2007 bid sample testing was corrected by the Army, and L-3 was allowed to fairly compete for the contract.[18]  In the context of the 2009 retesting, the court does not find any disparate treatment in the Army's requirement that L-3's bid sample, mounted according to markedly different attachment instructions, pass Reattachment retesting, even if the Army ultimately does not subject [ ] Aimpoint [ ] to Reattachment retesting.

Once the barrier to fair competition had been lifted in this procurement, the court discerns no disparate treatment if an offeror in the competitive range is to be treated differently from an offeror that has been eliminated from the competition. The solicitation clearly contemplates discussions with offerors in the competitive range, so that the Army can obtain an optimal product.  AR at 134; *Dynacs Eng'g Co. v. United States*, 48 Fed. Cl. 124, 130 (2000) ("The FAR [Federal Acquisition Regulation] authorizes discussions between the government and offerors once the

---

[18]/  It is clear from the record that the proper retesting protocol was not in place until April 2009.

competitive range is established in a procurement for the purpose of allowing an offeror to revise its proposal." (citing 48 C.F.R. § 15.306(d) (2008))).  L-3 could have provided identical bid samples for the 2009 retesting, but did not do so; L-3 was justifiably eliminated from the competition because of its failure to submit appropriate bid samples.  Because Aimpoint has not been eliminated by the Essential Criteria round of testing and will be included in the competitive range, it may then be treated differently.  *See* 48 C.F.R. § 1.102-2(c)(3) (2008) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same.").  In the context of the 2009 retesting, the court does not find that the Army's actions exhibit disparate, arbitrary or capricious treatment of L-3.

> **B.      Non-Identical Bid Samples Submitted for Essential Criteria Retesting are Not Analogous to Modified CCO's Provided as the Result of Discussions**

L-3 complains that the reason cited for removing its bid sample from further consideration, *i.e.*, the danger of relying on test results based on non-identical bid samples, should also prevent the Army from accepting [ ] Aimpoint [ ] without further Essential Criteria testing.  L-3 suggests that "the Army is plainly attempting to have it both ways," by holding L-3 to a harsh standard for identical bid samples but relaxing that standard for Aimpoint.  Pl.'s Mot. at 16.  The court finds this argument unpersuasive.

The Army had good reason to ensure that an offeror's bid samples submitted for Essential Criteria testing were identical.  It was a requirement set forth in the solicitation, and as the contracting officer noted, that policy "ensure[s] that soldiers are equipped with equipment meeting the essential criteria."  AR at 1041.  Only if an offeror has provided a set of identical bid samples for the fifteen Essential Criteria tests will those fifteen tests produce reliable results indicating whether or not that offeror's design will further "soldiers' safety and security."  *Id.*  When L-3 submitted non-identical bid samples for the 2009 retesting, the purpose of Essential Criteria testing was frustrated.  *See id.* ("If an offeror fails to provide identical bid samples, there is a possibility an offeror's product will be included within the competitive range but that the product will not have met the essential criteria to protect the needs of our soldiers.").

Aimpoint [ ] passed all Essential Criteria testing.  AR at 338-39.  There is no indication in the record that the Aimpoint [ ] 2007 bid samples were not identical. Thus, the solicitation's requirement for identical bid samples ensured that the Aimpoint [ ] design met all Essential Criteria, and that Aimpoint [ ] appropriately furthers soldiers' safety and security.  Aimpoint and L-3 have not been held to different standards, but to the same standard.

Once the Army establishes the competitive range, Aimpoint [ ] will be the only CCO that has met the elimination round requirements for this competition [ ] as these requirements are set forth in the solicitation.  *See* AR at 141 ("To receive consideration for award, a rating of Pass must be achieved under the Bid Sample factor, Essential Criteria subfactor.").  Aimpoint [ ] may then be modified according to the Army's requests, through discussions, as permitted by the solicitation.  *Id.* at 134; *see* 48 C.F.R. § 15.306(d) (noting that discussions "are undertaken with the intent of allowing the offeror to revise its proposal"); *see also ITAC*, 316 F.3d at 1321 ("Discussions need only be held with each offeror within the competitive range." (citing 48 C.F.R. § 15.306(d)(1))).  The concern for soldiers' safety and security may be met in any rational manner once Aimpoint [ ] has been placed in the competitive range.  In the context of the 2009 retesting, the court finds no disparate treatment of L-3, even if [ ] Aimpoint [ ] CCO is not required to undergo a second round of Essential Criteria testing.[19]

As this court stated in *L-3 I*, competitive range determinations of just one offeror are subject to close scrutiny.  *See* 83 Fed. Cl. at 650-51 (citations omitted). Here, the Army has indicated that its elimination of L-3 from this competition will lead to a competitive range of one offeror that has passed all fifteen Essential Criteria.  The Army's decision to eliminate L-3 survives close scrutiny, for the reasons given in this opinion.

## VII.  Supplementation of the Administrative Record

---

[19]/ The FAR contemplates that proposals in a negotiated procurement will be evaluated, then, if discussions are needed, a competitive range will be established based on the results of the proposal evaluations.  *See* 48 C.F.R. § 15.306(c)-(d).  For the proposals included within the competitive range, discussions and revisions to proposals follow.  *See id.* § 15.306(d).  There is no requirement in the FAR that these modified proposals then undergo a second round of testing for each and every evaluation measure used to rate the initial proposals.

Finally, the court turns its attention to a dispute between the parties as to which proffered declarations may be utilized to supplement the administrative record in this bid protest. A recent precedential decision of the United States Court of Appeals for the Federal Circuit, *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009), delineates the acceptable circumstances under which the administrative record may be supplemented in a bid protest. The *Axiom* panel criticized a recent decision of this court which permitted supplementation of the administrative record in a bid protest, and criticized the trial court's over-broad reliance on *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), a case which provides a list of justifications for the supplementation of the administrative record of an agency action. *Axiom*, 564 F.3d at 1379-81. There has since been some debate as to the correct application of the *Axiom* decision in bid protests before this court. *See, e.g.*, *Rhinocorps Ltd. v. United States*, No. 08-410C, 2009 WL 1588684, at *10 n.13, *13 n.18 (Fed. Cl. June 4, 2009) (discussing certain justifications for supplementation of the administrative record in a bid protest, in light of the *Axiom* decision); *DataPath, Inc. v. United States*, No. 09-188C, 2009 WL 1538083, at *4 n.3 (Fed. Cl. May 29, 2009) (discussing *Axiom*, and whether GAO records may supplement the administrative record in a bid protest in this court); *Holloway & Co. v. United States*, No. 09-53C, 2009 WL 1351413, at *9-*10 (Fed. Cl. May 7, 2009) (discussing whether, under *Axiom*, GAO records may supplement the administrative record in a bid protest in this court). This debate is helpful, but by no means dispositive of the supplementation issues in the subject matter.

The court notes that the *Axiom* panel adopted a restrictive standard for the supplementation of the administrative record in a bid protest, and favorably cited *Murakami v. United States*, 46 Fed. Cl. 731 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005). *Axiom*, 564 F.3d at 1380. The *Axiom* standard for supplementation of the administrative record in a bid protest is a direct quotation from *Murakami*, stating that "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735). The Federal Circuit relied on the cases cited by this court in *Murakami* to conclude that "[t]he purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735 and citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). The thrust of the *Axiom* decision, and *Murakami*, is that this court

24

must exercise restraint when considering whether or not to supplement the administrative record in a bid protest. *See id.* (favoring a "more restrictive approach" and questioning the vitality of *Esch*) (citations omitted); *Murakami*, 46 Fed. Cl. at 735 (stating that the construction of the *Esch* justifications for allowing the supplementation of an administrative record should be "extremely limited") (citations omitted). For these reasons, the court has carefully scrutinized the declarations submitted by the parties to determine whether these are proper supplements to the administrative record in this case, for the purposes of deciding the merits of this bid protest.[20]

     As the court understands *Axiom*, there is no reason to supplement the record in a bid protest if the documents proffered are not needed for an effective APA review of the government's procurement decision. Many of the declarations offered by the parties as supplements to the administrative record in this case addressed the results of the 2008 retesting of L-3's bid sample. Because the 2008 retesting scores were the results of an improper testing procedure, declarations supporting or contesting the 2008 retesting results are irrelevant to the court's APA review of L-3's elimination from this competition. For this reason, the declarations of [ ], Plaintiff's Exhibits 33 and 34, filed December 22, 2008, as well as the rebuttal declarations of [ ], filed on February 13, 2009 as attachments to defendant's first dispositive motion, are not acceptable supplements to the administrative record in this case and were not relied upon by the court.

     [ ] declaration, with its seven attachments, was filed on May 22, 2009 as an attachment to plaintiff's dispositive motion in the current round of briefing of this bid protest. Pl.'s Mot. Att. 1. [ ] declaration directly addresses the dispute before the court – whether the government's decision to eliminate L-3 from this competition, for failing to provide identical bid samples, was arbitrary or capricious. *See id.* L-3 argues that unless the court supplements the administrative record with [ ] declaration, "[L-3 will not have] had an opportunity to respond on the record to [the final two differences between the 2009 and 2007 bid samples noted by the Army]." Tr. at 26. Plaintiff apparently believes that it has an unfettered right to submit declarations giving its commentary on every aspect of the 2009 retesting process, and to have those declarations included in the administrative record. This is not the law. *See Axiom*, 564 F.3d at 1383 (stating

---

[20]/ [ ].

that absent "any persuasive explanation of why the record before the [contracting officer] precluded effective judicial review in th[at] case, we do not find the court's reliance on the [protestor's] declarations well placed"); *Rhinocorps*, 2009 WL 1588684, at *20 (striking the protestor's submitted declarations because "[t]hese documents proffer facts that substitute plaintiff's opinion for the [government's] technical determinations").

The post-hoc contentions of fact and argument provided by [ ] in his declaration were not before the Army as it made its decision to eliminate L-3 from this competition.  His declaration would be appropriate in a *de novo* review of the Army's decision, but a *de novo* review is not permitted by *Axiom* or, for that matter, by any of the binding precedent defining this court's bid protest jurisdiction.  The court has also considered whether its APA review of the Army's procurement decision could only be made effective by the inclusion of [ ] declaration in the administrative record.  The administrative record, however, adequately describes the issues in controversy and the decision-making of the Army.  [ ] declaration is thus not an acceptable supplement to the administrative record in this case and was not relied upon by the court.

## CONCLUSION

L-3 has not shown that the Army's decision to eliminate L-3 from this competition was arbitrary or capricious.  Because L-3's protest has not succeeded on the merits, the court need not proceed to the question of prejudice, or to the question of whether L-3 has shown that it is entitled to new injunctive relief from this court.  Plaintiff's Motion to Enforce the Court's Injunction, reviewed as plaintiff's motion for judgment on the administrative record, is denied, and Defendant's Motion for Relief from Stay, reviewed as defendant's motion for judgment on the administrative record, is granted.

Accordingly, it is hereby **ORDERED** that

(1)     Plaintiff's Motion for Preliminary Injunction, filed December 22, 2008, is **DENIED** as moot;

(2)     Plaintiff's Motion for Permanent Injunctive and Declaratory Relief, filed December 22, 2008, is **DENIED** as moot;

(3)     Plaintiff's Motion for Judgment upon the Administrative Record, filed January 29, 2009, is **DENIED** as moot;

(4)     Defendant's and Intervenor-Defendant's Cross-Motions for Judgment on the Administrative Record, both filed February 13, 2009, are **DENIED** as moot;

(5)     Defendant's Motion to Dismiss, filed February 25, 2009, is **DENIED** as moot;

(6)     Defendant's Motion to Strike [ ], filed February 2, 2009, is **GRANTED in part**, in that [ ] declarations are not proper supplements to the administrative record, and **DENIED in part**, as to striking these declarations from the docket;

(7)     Defendant's Motion to Strike [ ], filed May 28, 2009, is **GRANTED in part**, in that [ ] declaration is not a proper supplement to the administrative record, and **DENIED in part**, as to striking this declaration from the docket;

(8)     The court **DEFERS** ruling on [ ];

(9)     Defendant's Motion for Relief from Stay, filed May 5, 2009, is **GRANTED**;

(10)    Plaintiff's Motion to Enforce the Court's Injunction, filed May 22, 2009, is **DENIED**;

(11)    Pursuant to RCFC 54(b), insofar as there is no just reason for delay, the Clerk's Office is directed to **ENTER** judgment for defendant as to plaintiff's request for any and all injunctive relief preventing the Army from issuing a competitive range determination including only the Aimpoint [ ] CCO in the competitive range for Solicitation No. W15QKN-07-R-0428;

(12)   The parties shall **CONFER** and **FILE** a **Joint Status Report** on or before **July 10, 2009** indicating whether the dispute over [ ] will be settled, and if not, proposing a briefing schedule for said motion;

(13)   On or before **July 10, 2009**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(14)   Each party shall bear its own costs.


/s/Lynn J. Bush
LYNN J. BUSH
Judge